Sebco Dev., Inc. v Building Mgt. Assoc., Inc. (2024 NY Slip Op 50170(U))

[*1]

Sebco Dev., Inc. v Building Mgt. Assoc., Inc.

2024 NY Slip Op 50170(U)

Decided on February 20, 2024

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 20, 2024
Supreme Court, Bronx County

Sebco Development, Inc.; 479 COURTLANDT AVENUE HOUSING DEVELOPMENT FUND CORPORATION; CROTONA PARTNERS L.P.; FOX STREET HOUSING DEVELOPMENT FUND CORPORATION; HUNTS POINT HOUSING DEVELOPMENT FUND CORPORATION; ROSINA ASSOCIATES L.P.; TIFFANY GARDENS, L.P.; TIMPSON HOUSING DEVELOPMENT FUND CORPORATION; WILLIS AVENUE ASSOCIATES, L.P., Plaintiff(s),

against
Building Management Associates, Inc., Defendant(s).

Index No. 805674/23E

Counsel for Plaintiffs: Frankfurt, Kurnit Klein & Selz
Perlman & Perlman LLP
Counsel for Defendant: Clayman & Rosenberg LLP

Fidel E. Gomez, J.

In this action for, inter alia, declaratory judgment, plaintiffs move seeking an order pursuant to CPLR § 6301, granting them a preliminary injunction, inter alia, compelling defendant to turn over control of bank accounts containing funds belonging to plaintiffs [FN1]
479 COURTLANDT AVENUE HOUSING DEVELOPMENT FUND (Courtlandt), FOX STREET HOUSING DEVELOPMENT FUND CORPORATION (Fox), HUNTS POINT HOUSING DEVELOPMENT FUND CORPORATION (Hunts), ROSINA ASSOCIATES L.P. (Rosina), TIMPSON HOUSING DEVELOPMENT FUND CORPORATION (Timpton) and WILLIS AVENUE ASSOCIATES L.P. (Willis) (hereinafter all the foregoing plaintiffs will collectively and at times be referred to as "Courtlandt , Fox, Hunts, Rosina, Timpson, and Willis," "plaintiffs," or "property owners"). Plaintiffs contend that with respect to at least two of their causes of action - for conversion and declaratory judgment - they demonstrate a likelihood of success on the merits, irreparable harm if injunctive relief is denied, and that the equities favor injunctive relief. Defendant opposes the instant motion saliently averring that the record does not evince that plaintiffs are likely to succeed on the merits and as such, plaintiffs have not met the requisite burden of proof.
For the reasons that follow hereinafter, plaintiffs' motion is granted.
The instant action is for declaratory judgment, breach of contract, conversion, tortious interference with business relations, equitable accounting, unjust enrichment, and prima facie [*2]tort. The first amended complaint [FN2]
 alleges that plaintiff SEBCO DEVELOPMENT, INC. (Sebco) is a not-for-profit organization which provides affordable housing and charitable services in the Bronx. Sebco has sponsored the development of properties for the property owners in this action and provides oversight for such properties. Plaintiffs CROTONA PARTNERS L.P (Crotona), Courtlandt, Hunt, Rosina, plaintiff TIFFANY GARDENS, L.P. (Tiffany), Timpton, and Willis receive funding from governmental agencies, lenders and investors for the creation and preservation of low income housing. Although the foregoing agencies regulate the use of the foregoing funds, plaintiffs, including Sebco, operate the instant properties largely autonomously. The property owners own properties in Bronx County, which provide affordable housing to its tenants. Prior to January 2023, pursuant to conduct and written agreements, defendant, a not-for-profit organization, served as property manager for the properties owned by the property owners. Defendant's duties included leasing and maintaining the property owners' properties, which required that defendant maintain tenant data and tenant files to ensure compliance with city, state, and federal regulatory agreements, and hiring and overseeing maintenance staff. Plaintiffs and defendant enjoyed a beneficial relationship for many years, which included Sebco and defendant sharing office space and staff. Sebco's senior executive, Salvatore Gigante (SG) was also defendant's president and holds seats on both Sebco's board and the boards of the property owners. On January 9, 2023, non-parties Luigino Gigante (GG), owner of 20 percent of defendant's shares and defendant's President, and Irwin Siegel (Siegel), who controls 80 percent of defendant's shares, former counsel to plaintiffs and counsel to defendant, entered the space jointly occupied by Sebco and defendant. At the time, GG and Siegel were accompanied by armed guards who yelled at and intimidated employees. GG and Siegel attempted to break into SG's safe and another individual who accompanied GG and Siegel rummaged through SG's desk. On January 10, 2023, GG and Siegel engaged in similar behavior and Siegel threatened Sebco's employees. Based on the foregoing, and because GG lacked the requisite knowledge to be defendant's President, on January 11, 2023, the property owners decided to terminate their relationship with defendant and further determined that Sebco would assume the management of the property owners' properties. All relevant agencies were notified of the foregoing decision and none have objected. As of March 1, 2023, with the exception of Tiffany and Crotona, the New York City Department of Housing Preservation and Development (HPD) approved plaintiffs' request to replace defendant with Sebco. In response to its termination, defendant embarked on a course of conduct, which is alleged to have damaged plaintiffs. On January 17, 2023, defendant and GG denied plaintiffs the ability to access their own bank accounts, which access has never been restored. Moreover, while defendant ceased providing management services and despite being terminated, defendant has continued to draw management fees from bank accounts belonging to Courtlandt, Crotona, Fox, Hunts, Rosina, Tiffany, and Willis. Defendant has also impeded Sebco's attempt to assume management functions for the foregoing plaintiffs. Specifically, defendant has, inter alia, refused to comply with requests that Sebco be provided with information regarding the property owners' buildings which defendant previously managed, refused to relinquish control of millions of dollars belonging to the property owners, refused to provide plaintiffs with information regarding the property owners' bank accounts, and has refused to relinquish control over plaintiffs' data. As a result, payments to plaintiffs' vendors have either been delayed or have not been made at all, tenants' complaints have gone unanswered, and [*3]plaintiffs' bank accounts have not been managed. Despite knowledge that the relevant agencies will not reinstate defendant as the property owners' property manager, defendant's goal is to reestablish its management of the property owners' properties, while concomitantly destroying Sebco. Notably, defendant has wrongfully interfered with Sebco's relationships with regulatory agencies so as to thwart efforts by Sebco to assume management of any properties. As a result, the United States Department of Housing and Urban Development (HUD), did not allow Sebco to manage other properties that also terminated defendant as their property manager, but which sought to have Sebco assume defendant's role. With respect to plaintiffs' bank accounts, the same are with Flagstar Bank. Since May 2023, prior to which defendant had provided plaintiffs with some bank account information, despite repeated requests that defendant relinquish control over the accounts, plaintiffs have had no access to the foregoing accounts nor have they received any information regarding the same. The foregoing has made it impossible to properly manage the property owners' properties and has created compliance and regulatory issues for plaintiffs. Specifically, defendant has failed to apply Section 8 payments to the respective tenant accounts at the properties owned by the property owners, which is likely to cause a cancellation of said subsidies by HPD. With regard to data necessary to manage plaintiffs' properties, such data, consisting of tenant rental ledgers, balances, and reports is accessed and stored using MRI Software (MRI). MRI is a provider of software for use in property management. Information related to plaintiffs' properties is hosted by MRI under an account shared by Sebco and defendant. The data in the foregoing account is necessary to manage plaintiffs' properties because, inter alia, it allows Sebco to ensure that necessary government subsidies are received to operate the properties. Despite demands made to defendant and even though Sebco paid a majority of the fees associated with the use of MRI, defendant has refused to allow plaintiffs to access MRI data. Plaintiffs allege that defendant's actions and conduct has caused plaintiffs significant economic, operational, and reputational harm. 
Based on the foregoing, plaintiffs interpose seven causes of action. The first cause of action is for declaratory judgment wherein plaintiffs seek a declaration that defendant has been relieved as the property owners' property manager and that, as such, plaintiffs are entitled to access to and control of their bank accounts at Flagstar Bank and plaintiff's MRI data. The second cause of action is for breach of contract wherein it is alleged that by refusing to relinquish control of plaintiffs' bank accounts and paying itself unearned management fees, defendant has breached the management agreement between the parties. The third cause of action is for conversion wherein it is alleged that since plaintiffs have a possessory interest in their MRI data and the funds in the accounts at Flagstar Bank, which despite demand, defendant has refused to return, defendant has converted the funds and the data. The fourth cause of action is for tortious interference with business relations wherein it is alleged that defendant has wrongfully interfered with plaintiffs' relationships with MRI, Flagstar Bank and numerous government agencies thereby causing plaintiffs to sustain economic damage. The fifth cause of action is for equitable accounting wherein it is alleged that insofar as plaintiffs and defendants have a fiduciary relationship, by which the latter has a duty to handle funds and property, to maintain information, and to account for its handling to the foregoing, defendant's failure to properly discharge its obligations, warrant an accounting. The sixth cause of action is for unjust enrichment wherein it is alleged that by retaining unearned management fees belonging to plaintiffs, defendant has unjustly enriched itself at plaintiffs' expense. The seventh cause of action is for prima facie tort wherein it is asserted that the defendant's conduct alleged in the complaint was and is being perpetrated maliciously and without justification in order to damage Sebco and its management of property owners' properties.
Plaintiffs' motion seeking a preliminary injunction is treated as one which also seeks a mandatory preliminary injunction and is granted. Significantly, on this record, plaintiffs establish all the requisite elements warranting the issuance of a preliminary injunction, including a high likelihood of success on the merits on their causes of action for declaratory judgment and conversion. Moreover, because absent immediate access to the property owners' bank accounts [*4]and MRI data, Sebco will be forced to discharge staff and/or will cease operating altogether and because the property owners', if left bereft of management, will be unable to manage their properties, will lose the government funding required to operate the properties and could also cease operating, it is clear that the circumstances here are extraordinary so as to warrant the issuance of a mandatory preliminary injunction requiring defendant to immediately relinquish control of plaintiffs' bank accounts and MRI data and take whatever affirmative acts are required to allow plaintiffs to access and control the same.
 Standard of Review
CPLR § 6301 describes the grounds upon which the court can grant a preliminary injunction and reads, in pertinent part, as follows:
A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff.
Thus, a preliminary injunction "provide[s] a provisional remedy by maintaining the status quo pending a full hearing on the merits, rather than to determine the ultimate rights of the parties and mandate corrective action" (Jamie B. v Hernandez, 274 AD2d 335, 336 [1st Dept 2000]). Accordingly, the court should not, on a motion for a preliminary injunction, grant the ultimate relief sought in the underlying action (id. at 336).
Because a preliminary injunction substantially limits a defendant's rights and is, therefore, an extraordinary provisional remedy, it requires a special showing (Margolies v Encounter, Inc., 42 NY2d 475, 479 [1977]. Hence, a preliminary injunction will only be granted when the party seeking such relief demonstrates a likelihood of ultimate success on the merits, irreparable injury if the preliminary injunction is withheld, and a balance of equities tips them in favor of the moving party (Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; Doe v Axelrod, 73 NY2d 748, 750 [1988]; 61 West 62 Owners Corp. v CGM EMP LLC, 77 AD3d 330, 334 [2010], mod 16 NY3d 822 [2011]; Second on Second Cafe, Inc. v Hing Sing Trading, Inc., 66 AD3d 255, 264 [1st Dept 2009]; Stockley v Gorelik, 24 AD3d 535, 536 [2005]). The proponent of a preliminary injunction must establish entitlement to such relief by clear and convincing evidence (Uber Tech., Inc. v Am. Arbitration Assn., Inc., 204 AD3d 506, 508 [1st Dept 2022]; Gilliland v Acquafredda Enterprises, LLC, 92 AD3d 19, 24 [1st Dept 2011]). Clear and convincing evidence means "evidence which makes it highly probable that the alleged activity actually occurred" (Ferreyra v Arroyo, 35 NY3d 127, 128 [2020] [internal quotation marks omitted]; Rudovic v Rudovic, 190 AD3d 997, 999 [2d Dept 2021]; People v Stewart, 61 AD3d 1059, 1060 [3d Dept 2009]; People v Warrior, 57 AD3d 1471, 1472 [4th Dept 2008]; Quezada v O'Reilly-Green, 24 AD3d 744, 746 [2d Dept 2005]; People v Donaldson, 138 AD2d 730, 730 [2d Dept 1988]).
It is well settled that "he who comes to equity must come with clean hands" (Amarant v D'Antonio, 197 AD2d 432, 434 [1st Dept 1993]). Thus, injunctive relief is unavailable if the proponent of such relief has unclean hands with respect to the events undergirding the litigation (id. at 434 ["It is an ancient maxim that he who comes to equity must come with clean hands. The gravamen of plaintiff's position is that defendants are bound by the shareholders' agreement to sell their shares to the corporation. His brief, however, assiduously avoids any application of the same reasoning to the retirement agreement, which obligates plaintiff to sell his shares to the three employees. Plaintiff will not be heard to complain that defendants are to be restrained from an asserted violation of one agreement under circumstances in which their resort to its provisions was induced by plaintiff's violation of a subsequent agreement. Injunctive relief should have been denied on this ground alone."]; see Victor Fischel & Co. v R. H. Macy & Co., 20 NY2d 180, 187 [*5][1967] ["No principle is better established than that a plaintiff should be denied an injunction where it lacks equitable standing to obtain affirmative equitable relief."]; 276-43 Gourmet Grocery, Inc. v 250 W. 43 Owner LLC, 143 AD3d 432, 433 [1st Dept 2016] ["Defendants' contention that plaintiff's unclean hands bar it from obtaining the equitable relief of an injunction is preserved but unavailing, since defendants made no showing that they had been injured by plaintiff's allegedly obtaining a liquor license under false pretenses."]). However, unclean hands serves to bar equitable relief only if "the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct" (Natl. Distillers & Chem. Corp. v Seyopp Corp., 17 NY2d 12, 15-16 [1966] [internal quotation marks ommited].).
With respect to likelihood of success on the merits, the threshold inquiry is whether the proponent has tendered sufficient evidence demonstrating ultimate success in the underlying action (Doe at 750-751). While the proponent of a preliminary injunction need not tender conclusive proof beyond any factual dispute establishing ultimate success in the underlying action (Sau Thi Ma v Xuan T. Lien, 198 AD2d 186, 187 [1993], lv dismissed 83 NY2d 847 [1994]; Ying Fung Moy v Hohi Umeki, 10 AD3d 604, 605 [2004]), "[a] party seeking the drastic remedy of a preliminary injunction must [nevertheless] establish a clear right to that relief under the law and the undisputed facts upon the moving papers" (Gagnon Bus Co., Inc. v Vallo Transp., Ltd. 13 AD3d 334, 335 [2004]). This, of course, does not mean that plaintiff must conclusively establish guaranteed success on the merits and, thus, issues of fact raised by the defendant cannot serve as a basis for denial of any motion seeking a preliminary injunction (Ma at 187; Moy at 605; Stockely at 536; Demartini v Chatham Green, Inc., 169 AD2d 689, 689 [1st Dept 1991]). In Doe, plaintiffs, a coalition of various members of the medical and pharmaceutical communities, sued seeking a declaration that 100 NYCRR 80.67 - which imposed strict control on certain tranquilizing medications - be declared unconstitutional (id. at 749). Plaintiffs also sought a preliminary injunction enjoining defendant, the State, from enforcing the challenged regulation (id.). The court denied plaintiffs' request for a preliminary injunction, holding that because plaintiffs failed to establish that defendant "acted outside of the authority constitutionally delegated to him under the Public Health Law or that the regulation was so lacking in reason for its promulgation that it [was] essentially arbitrary" (id. at 750 [internal citations and quotation marks omitted]), they failed to establish a likelihood of success on the merits (id.). Conversely, in Stockley, the court granted plaintiffs' - owners of a condominium - application for a preliminary injunction, thereby enjoining defendants - also owners of the condominium - from building a structure, which plaintiffs established would "encroach upon portions of the common elements of the condominium, which may require an easement the defendants did not seek, and would deprive the plaintiffs of the use and enjoyment of certain common elements, as well as portions of their own units" (id. at 536). The court held that plaintiffs' evidence established a likelihood of success on the merits insofar as they demonstrated that they had initially authorized defendants' proposed construction without being fully apprised of its extent, which did not become known until plans were drawn (id.). 
With regard to irreparable harm, generally, the inquiry is whether in the absence of a preliminary injunction, usually to preserve the status quo, any judgment on the underlying action would be rendered ineffectual (Ma at 186; Moy at 604). When this is the case, the proponent of a preliminary injunction has demonstrated irreparable harm. In Ma, plaintiff sued to recover payments from a winning lottery ticket, such winnings held by the defendant (id. at 186). Finding that a preliminary injunction was warranted, the court held that since it was clear that defendant intended to spend the proceeds at issue - intending to share the funds with his family - it was clear that absent a preliminary injunction, plaintiff would be irreparably harmed inasmuch as any judgment would be rendered ineffectual (id. at 186). The court in Moy similarly held that plaintiff had demonstrated irreparable harm but for the grant of preliminary injunction. In that case, plaintiff sued to void the transfer of her ownership interest in real property on grounds that [*6]such transfer was obtained by fraud (id. at 604). In holding that plaintiff established entitlement to a preliminary injunction, the court noted that "[t]he purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual" (id. 604), and thus, that absent the preliminary injunction, defendant could transfer the property, thereby irreparably harming plaintiff (id.). It is well settled that for purposes of injunctive relief, "[i]rreparable injury, for purposes of equity, has been held to mean any injury for which money damages are insufficient" (McLaughlin, Piven, Vogel, Inc. v W.J. Nolan & Co., Inc., 114 AD2d 165, 174 [2d Dept 1986]). Stated differently, if the damages sought can be calculated and if plaintiff can be made whole with money damages, then the irreparable injury prong, a requisite for preliminary injunctive relief, cannot be established (Musey v 425 E. 86 Apartments Corp., 154 AD3d 401, 404 [1st Dept 2017] ["Moreover, injunctive relief is not available, because money damages are readily ascertainable."]; Mini Mint Inc. v Citigroup, Inc., 83 AD3d 596, 597 [1st Dept 2011] ["We agree with the motion court that plaintiff failed to establish a prima facie case for a permanent injunction requiring defendant to fully repair the premises' employee bathroom and restore it to its original condition. In particular, plaintiff failed to establish that it does not have an adequate remedy at law, namely monetary damages."]; Destiny USA Holdings, LLC v Citigroup Glob. Markets Realty Corp., 69 AD3d 212, 220 [4th Dept 2009] ["As noted above, irreparable injury generally cannot be established where any damages sustained are calculable, because the plaintiff in such a case would have an adequate remedy in the form of monetary damages."]).
With regard to the balancing of equities, the same requires that the court look at the prejudice which may accrue to the parties in the event the application for an injunction is granted or denied (Ma at 186-187). In other words, the proponent of a preliminary injunction must show "that the irreparable injury to be sustained is more burdensome to the plaintiff than the harm caused to defendant through imposition of the injunction" (McLaughlin, Piven, Vogel, Inc. at 174 [internal quotation marks omitted]; see Nassau Roofing & Sheet Metal Co., Inc. v Facilities Dev. Corp., 70 AD2d 1021, 1022 [3d Dept 1979], appeal dismissed 48 NY2d 654 [1979]). Thus, usually the equities tip in favor of the party who would be irreparably harmed absent the grant of a preliminary injunction (Ma at 187). Thus, should the court determine that plaintiff would be irreparably harmed by denial of the preliminary injunction while defendant would suffer little or no harm if said injunction is granted, then a preliminary injunction should be granted (id.).
Notably, while CPLR § 6301 authorizes a preliminary injunction "restraining the defendant from the commission or continuance of an act," "it is doubtless within the power of a court of equity, in proper cases, to issue mandatory injunctions, and the provisions of the Code should not be so strictly construed as to deny that power in any case." (Bachman v Harrington, 184 NY 458, 463 [1906]). Thus, where appropriate, a court has the power to issue a mandatory injunction, which disrupts rather than preserves the status quo, and whereby a party is affirmatively ordered to perform an act (id. at 464 ["Therefore, where the complainant presents a case showing or tending to show that affirmative action by the defendant, of a temporary character, is necessary to preserve the status of the parties, then a mandatory injunction may be granted."]; Second on Second Cafe, Inc. at 265 ["Moreover, a mandatory preliminary injunction (one mandating specific conduct), by which the movant would receive some form of the ultimate relief sought as a final judgment, is granted only in unusual situations, where the granting of the relief is essential to maintain the status quo pending trial of the action" [internal quotation marks omitted].); Rosa Hair Stylists, Inc. v Jaber Food Corp., 218 AD2d 793, 794 [2d Dept 1995]). Mandatory injunctions, however, should not be granted, absent extraordinary circumstances and only when the right to such relief is clearly established (Second on Second Cafe, Inc. at 360-361; Rosa Hair Stylists, Inc. at 794). In Second on Second Cafe, Inc., the court granted plaintiff's application for a mandatory preliminary injunction, ordering
a mandatory preliminary injunction directing the landlord to permit the tenant to install, at its own expense, a new exterior exhaust vent on the roof of the building, along with the necessary ducts between the kitchen and the roof, and further directing the landlord to [*7]execute the permit applications required for such work.
(id. at 256-257). In that case, plaintiff, a tenant in a building owned by the defendant, sought a mandatory preliminary injunction after the defendant allowed the owner of the adjacent building to remove the exhaust vent servicing plaintiff's business, a bar with a kitchen, which served food (id. at 257-259). Because removal of the vent substantially impaired plaintiff's ability to profitably operate its business, plaintiff sought to reinstall the vent on the roof of defendant's property (id. at 259). In granting plaintiff's application for a mandatory injunction, the court found that the absence of prejudice to defendant tipped the equities in favor of granting an injunction, that plaintiff established a likelihood of success on the merits, and irreparable harm but for the issuance of the injunction (id. at 273-274). With regard to the last two factors, whose establishment also warranted the grant of a mandatory injunction, the court noted that
[g]iven the strong case Café made for its likelihood of success on the merits, we are satisfied that Café's showing of irreparable harm warranted relief. Moreover, we find that Café demonstrated that it met the heightened standard for the grant of a mandatory preliminary injunction, namely, that the situation was an "unusual" one in which a preliminary injunction mandating specific conduct by the movant's adversary was "essential to maintain the status quo pending trial of the action
(id. at 273).
Pursuant to CPLR § 6312(b),
prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally determined that he or she was not entitled to an injunction, will pay to the defendant all damages and costs which may be sustained by reason of the injunction
Thus, an undertaking is a condition precedent to the grant of a preliminary injunction and such requirement cannot be waived by the court (Rourke Developers Inc. v Cottrell-Hajeck Inc., 285 AD2d 805, 805 [3d Dept 2001]; Smith v Boxer, 45 AD2d 1054, 1054 [2d Dept 1974]). The amount of such undertaking is solely within the court's discretion and should be as much as rationally necessary to compensate defendant for any potential damages should it later be determined that a preliminary injunction was unwarranted (Clover St. Assoc. v Nilsson, 244 AD2d 312, 313 [2d Dept 1997]; Kazdin v Putter, 177 AD2d 456, 457 [1st Dept 1991]). The undertaking represents the amount and indeed the limit of damages to which defendant will be entitled if it is determined that no preliminary injunction ought to have been granted (Bonded Concrete, Inc. v Town of Saugerties, 42 AD3d 852, 855 [3d Dept 2007]).
Pursuant to CPLR § 2501(1) and (2), an undertaking is
[a]ny obligation, whether or not the principal is a party thereto, which contains a covenant by a surety to pay the required amount, as specified therein, if any required condition, as specified therein or as provided in subdivision (c) section 2502, is not fulfilled; and . . . any deposit, made subject to the required condition, of the required amount in legal tender of the United States or in face value of unregistered bonds of the United States or of the state.

 CPLR § 2502(a)(1) and (2) defines a surety as an insurance company or a natural person, except an attorney.
 Discussion   
In support of the instant motion, plaintiffs submit an affidavit by SG, Sebco's Chief Operating Officer (CEO), who reiterates the allegations in the amended complaint and further states, in pertinent part, the following. Sebco is a not-for-profit organization founded by Father Louis Gigante (FLG), whose aim in forming Sebco was to build, rehabilitate and maintain affordable housing in the South Bronx, while also providing other critical resources to the [*8]community. Sebco by itself and through its affiliates has sponsored the development of the property owners' affordable housing buildings and provides operational and fiscal support to the same. The property owners hold legal title and/or beneficial title to affordable housing buildings in the Bronx. The buildings provide subsidized affordable housing and are occupied by more than 3000 low-income tenants. The property owners aim to ensure the tenants have access to a safe, secure, and clean living environment. Sebco and the property owners are affiliated, with the latter being controlled by boards comprised of directors appointed by the former. Defendant was also founded by FLG in order to provide property management services. Prior to January 2023, Sebco and defendant shared a close working relationship, shared office space, employees, and resources. Notably Sebco and defendant shared in the costs attributable to the foregoing shared resources. SG previously worked for defendant and started his employment thereat in 2004. SG was first hired by defendant as a property manager, where he learned all aspects of defendant's operations. Thereafter, SG was promoted to defendant's Vice President and ultimately he became defendant's President. Prior to January 2023, defendant managed the properties owned by the property owners. As the property manager for the property owners' affordable housing properties, defendant's role was critical to the property owner's compliance with applicable regulatory agreements and the payment of any mortgages. In addition, defendant was responsible for, inter alia, marketing vacant apartments, entering into leases at the buildings, collecting and maintaining tenant data and files, hiring and supervising staff at the buildings, reviewing and reconciling bank account activities on a monthly basis, and working with agencies to process Section 8 rental subsidies. On January 9 and 10, 2023 after FLG died, GG - FLG's son - and Siegel - FLG's former attorney and the executor of FLG's estate - came to the offices shared by Sebco and defendant accompanied by armed guards. GG left a letter, wherein he terminated SG and subsequently installed himself as defendant's president. The events which occurred on the foregoing date, which are described by other affidavits provided to the Court, intimidated defendant and Sebco's staff, so much so that several of defendant's employees resigned. As a result of the foregoing event, effective February 25, 2023, the property owners terminated defendant as their property manager and selected Sebco to assume defendant's role. Rather than cede management responsibilities to Sebco, on January 17, 2023, defendant along with Siegel and GG prevented the property owners from accessing their own bank accounts, which contain millions of dollars belonging to the property owners. Defendant also continued to pay themselves unearned management fees totaling $168,000. Specifically, the property owners have bank accounts for their properties at Flagstar Bank, to which SG was a signatory. The bank accounts contain funds comprised of rental payments received from tenants at the properties as well as other revenue received in connection with the properties. On the foregoing date, GG and Siegel removed SG as a signatory to the accounts and have effectively blocked Sebco and the property owners from accessing the accounts. Since the foregoing date, plaintiffs have been unable to access the funds in the foregoing accounts, have been unable to sign checks, view bank activity or receive statements. Demands for access to the accounts have proved fruitless and at best, until May 2023, defendant shared only very limited data with Sebco's staff in order to allow them to perform some management functions. The foregoing denial of access has been very detrimental to plaintiffs. Specifically, Sebco has been unable to perform its management duties for the properties, including overseeing and tracking deposits, and performing monthly reconciliations of the accounts. After defendant was terminated it also blocked plaintiffs' access to data necessary to perform all management functions for their properties. Specifically, tenant rental ledgers, balances, and reports are required for the management of plaintiffs' properties and that data is accessed via MRI, a third-party vendor and provider of real estate software applications. MRI was initially retained by Sebco and defendant to support Sebco and defendant's work. The account contains information owned by plaintiffs, was previously shared by the parties, is titled BMA/SEBCO, and the cost of MRI was shared by Sebco and BMA. Once defendant was terminated, GG altered the access to MRI, giving himself exclusive administrator rights. Although Sebco and plaintiffs have been blocked from accessing MRI, prior to August [*9]2023, defendant had provided Sebco with some sporadic access. However, as of August 2023, Sebco has had no access to MRI, which has made it impossible for Sebco to provide functions essential for the management of the property owners' buildings. Since March 2023, defendant owes MRI $50,000, such delinquency negatively impacting plaintiffs. In January 2023, once defendant was terminated, plaintiffs contacted HPD, informing them that Sebco would assume the role of property manager for the property owners, and requesting HPD's approval for the change. HPD understood and had no issue with Sebco assuming the role pending HPD's approval. In June 2023, plaintiffs provided HPD with proposed management agreements, and in July 2023, HPD approved Sebco's management of Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis. Thereafter, such approval was made retroactive to March 1, 2023, the management agreements were executed, on August 10, 2023 defendant was so-apprised, and plaintiffs again demanded access to their bank accounts and MRI data. Despite being apprised by an HPD representative and then being provided with an email from HPD confirming HPD's consent to have Sebco assume defendant's management role for the property owners, defendant has nevertheless ignored all requests to allow plaintiffs access to plaintiffs' bank accounts and MRI data. SG asserts that the defendant's conduct has harmed and will continue to irreparably harm plaintiffs and the tenants in their properties. First, the property owners' inability to access their own bank accounts and MRI data creates a risk that the tenants therein will lose Section 8 rental subsidies, which are essential to their continued housing. Specifically, approximately 135 tenants residing within plaintiffs' properties receive Section 8 subsidies from the New York City Housing Authority (NYCHA), which pay a significant portion of each tenant's rent. Such subsidies require that the property manager credit and allocate the rent subsidy for each tenant and requires the reconciliation of the bank accounts to ensure that the information therein is kept current. Since defendant's termination in January 2023, and more specifically since May 2023, the foregoing reconciliation has not occurred and tenants have expressed concern that rent subsidies have not been credited to their accounts. If such subsidies are not credited, tenants will be forced to find new housing, which, given the lack of such housing and the expenses associated with relocation, will irreparably harm the foregoing tenants. Second, the loss of rent subsidies will also harm the property owners, since they rely on rent subsidies to fund and operate their buildings. Lastly, Sebco's inability to manage the properties will lead to the loss of Section 8 subsidies and will result in Sebco having to close and cease operating.
Plaintiffs submit an affidavit by Celina Santana (Santana), Sebco's Accounts Payable Manager, wherein she states, in pertinent part, the following. Between 1989 and 2023, Santana was employed by defendant as an Accounts Payable Manager. During that time, defendant provided property management services for the property owners, namely Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis. While in defendant's employ, Santana's duties included entering and researching invoices, paying bills, researching and communicating with vendors regarding sums owed to them. During the foregoing time period, Santana provided similar services to Sebco, with whom defendant shared office space and resources. On January 9 and 10, 2023, GG entered the foregoing shared space with armed individuals, disrupting and upsetting the staff. Thereafter, GG and Siegel terminated SG from defendant's employ and GG named himself defendant's president. Prior thereto, SG had been the head of both Sebco and defendant. Defendant then denied its staff access to the property owner's bank accounts, which access was necessary to provide the property owners with property management services. As a result of the foregoing, in February 2023, Santana resigned from defendant's employ and was hired by Sebco. With respect to her responsibilities, they are the same at Sebco as they were when she worked for defendant. In order to appropriately perform her work, Santana and Sebco require complete control and access to the property owners' bank accounts. However, since February 2023, Sebco has had no access to the relevant bank accounts, was initially provided only limited information concerning the same, and as of May 2023, has been provided no relevant information at all. Thus, Santana has found it difficult to perform her work in a competent and responsible manner.
Plaintiffs submit an affidavit by Sonal Shah (Shah), Sebco's Controller, who states, in [*10]pertinent part, the following. Shah has been Sebco's Controller for three and one half years. His duties include overseeing Sebco's financial matters and finance staff. Shah reports directly to SG. Prior to January 2023, SG had been defendant's President, Sebco and defendant shared office space and resources, and Shah supervised the fiscal department for both Sebco and defendant. While defendant previously provided property management services for the property owners, namely Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis, currently, after receiving HPD approval, Sebco has assumed defendant's role. In January 2023, after entering the offices shared by defendant and Sebco with armed guards, GG took over as defendant's President. Thereafter, Sebco was prevented from accessing the bank accounts belonging to the property owners as well as their MRI data, the latter housing all data related to the property owners' buildings. One of Sebco's responsibilities with respect to the property owners is to issue checks related to the property owners' buildings. This requires knowledge of the funds within the relevant bank accounts. Since being denied access to the bank accounts and at best only receiving some sporadic account information from GG, Sebco has been unable to prepare reconciliations for the property owners, an important task. In addition, unable to ascertain if the funds in the accounts are sufficient to cover checks issued from those accounts, Sebco has overdrawn those accounts, has been unable to field inquiries from vendors who provide services to the property owners, and cannot verify if a payment to a vendor has cleared. Requests to GG that Sebco's access to the property owners' accounts be restored have been unavailing. Based on the foregoing, Sebco, who is required to provide auditors with detailed financial information concerning the property owners' buildings, will be unable to provide the same. This is because such information requires documentation from bank accounts, such as general ledgers as well as information only available from MRI. The foregoing is likely to harm the tenants residing in the buildings owned by the property owners. 
Plaintiffs submit a sworn declaration by Latoya Allen (Allen), Sebco's Chief Operating Officer (COO), who states, in pertinent part, the following. Until February 2, 2023, Allen was the COO of both Sebco and defendant. Prior to January 2023, defendant provided property management services to the property owners. Sebco and defendant shared space and resources and SG was President of both Sebco and defendant. On January 9, 10, and 11, 2023, GG and Siegel came into Sebco and defendant's shared office with several armed guards. The guards blocked doorways and stairwells, and brandished weapons. Having broken into another locked office, GG and Siegel attempted to break into SG's locked office. Allen unlocked SG's office and a man that GG and Siegel brought with them rummaged through the office and took several items therefrom. Allen was confined to a conference room, where she was compelled to stay for most of the day. GG and Siegel urged Allen to resign from Sebco and indicated that they had fired SG as defendant's President. Thereafter the police were called, a fake gun and police badge were recovered from a stairwell, and one of the armed men with GG and Siegel was arrested for impersonating a police officer. On January 17, 2023, GG denied defendant's employees access to the property owners' bank accounts. This impeded the ability to provide the property owners with management services. Thereafter, the property owners terminated defendant and hired Sebco to provide management services to them. Allen then resigned as defendant's COO.
Plaintiffs also submit a legion of documents. The Court will endeavor to discuss only those documents which are relevant to the instant decision. 
First, plaintiffs submit a document, which evinces that Courtlandt, Fox, Hunts, Rosina, Timpspon, and Willis own 17 bank accounts. Some of the accounts are labeled as operating accounts, while others are labeled as replacement reserve, money market, operating reserve, and painting reserve accounts.
Second, plaintiffs submit a document, which evinces that plaintiffs' MRI data is spread over 17 separate accounts. 
Third, plaintiffs submit 6 resolutions, each one dated January 20, 2023, which evince that Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis' respective board of directors voted to terminate defendant as the property manager for the buildings owned by the property owners. 
Fourth, plaintiffs submit an email dated January 26, 2023, sent to HPD by SG on behalf of Sebco, wherein HPD is apprised that plaintiffs terminated defendant and had retained Sebco to resume the management of the buildings owned by the property owners. 
Fifth, plaintiffs submit six management agreements, dated March 1, 2023, which indicated that as of the foregoing date, Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis appointed Sebco to manage the buildings owned by them. 
Sixth, Plaintiffs submit an email, dated June 12, 2023, sent by SG on behalf of Sebco to HPD, which indicates that the management agreements appointing Sebco as the property manager for the buildings owned by the property owners were appended thereto.
Seventh, plaintiffs submit an email, dated July 28, 2023, from HPD to SG, wherein HPD apprises SG that it has approved Sebco's management of Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis. The email indicates that while prior requests were made as early as January 26, 2023, HPD did not begin its review of Sebco's request until April 12, 2023 and thereafter reviewed revisions submitted as late as July 24, 2023. 
Eighth, plaintiffs submit an email, dated August 17, 2023, from HPD to SG, wherein HPD indicates that it spoke to GG and notified him of HPD's approval by the property owners that Sebco assume the management of their buildings.
Ninth, plaintiffs submit an email, dated August 17, 2023, sent by plaintiffs' counsel to defendant's counsel, apprising him that GG had been notified that Sebco had been approved to manage the buildings owned by Courtlandt, Crotona, Fox, Hunts, Rosina, Tiffany, and Willis.
Tenth, plaintiffs submit a legion of email correspondence between Sebco and/or their counsel and defendant and/or their counsel. Collectively, the emails, which begin around June 2023 chronicle (1) Sebco's failed attempts to have defendant relinquish control of Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis bank accounts and MRI data in order to allow them to manage their respective properties; (2) Sebco's complaints that bank account information provided by defendant was inadequate to allow Sebco to perform its responsibilities for the property owners; and (3) and defendant's contention that as of July 28, 2023, they had not received confirmation from HPD that they had approved Sebco to assume management responsibilities for Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis.
Eleventh, plaintiffs submit a document evincing that between April and July 2023, defendant had paid itself management fees from Courtlandt, Crotona, Fox, Hunts, Rosina, Tiffany, and Willis' bank accounts totaling $168,000.
Twelfth, plaintiffs submit an email, dated July 24, 2023, sent by Enterprise, Rosina's limited partner, which evinces that it had approved Sebco's management of Rosina's buildings as of March 1, 2023.
Based on the foregoing, plaintiffs establish entitlement to preliminary injunctive relief. 
As previously noted, a preliminary injunction will only be granted when the party seeking such relief demonstrates a likelihood of ultimate success on the merits, irreparable injury if the preliminary injunction is withheld, and a balance of equities tips them in favor of the moving party (Nobu Next Door, LLC at 840; Doe at 750; 61 West 62 Owners Corp. at 334; Second on Second Cafe, Inc. at 264; Stockley at 536). Further, the proponent of a preliminary injunction must establish entitlement to such relief by clear and convincing evidence (Uber Tech., Inc. at 508; Gilliland at 24), meaning "evidence which makes it highly probable that the alleged activity actually occurred" (Ferreyra at 128 [internal quotation marks omitted]; Rudovic at 999; Stewart at 1060; Warrior at 1472; Quezada at 746; Donaldson at 730). 
Here, plaintiffs establish all the necessary elements for preliminary injunctive relief. First, plaintiffs establish a likelihood of success on the merits with respect to at least two of the causes of action in the first amended complaint, namely a declaratory judgment and conversion. With respect to likelihood of success on the merits, again, the threshold inquiry is whether the proponent has tendered sufficient evidence demonstrating ultimate success in the underlying action (Doe at 750-751). However, the proponent of a preliminary injunction need not tender conclusive proof beyond any factual dispute establishing ultimate success in the underlying [*11]action (Ma at 187; Moy at 605), and need only " establish a clear right to that relief under the law and the undisputed facts upon the moving papers" (Gagnon Bus Co., Inc. at 335).
Upon a review of the record against the backdrop of the law applicable to declaratory judgments, plaintiffs clearly establish a likelihood of success on the merits with respect to that cause of action. Significantly, CPLR § 3001 provides, in relevant part, that
[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. If the court declines to render such a judgment it shall state its grounds.
Generally, a declaratory judgment is intended to declare the respective legal rights of the parties based on specific facts and is not intended to declare findings of fact (Touro College v Novus University Corp., 146 AD3d 679, 679-680 [1st Dept 2017]; Thome v Alexander & Louisa Calder Found., 70 AD3d 88, 100 [1st Dept 2009]). Stated differently, the general purpose of a declaratory judgment is to quiet or stabilize an uncertain or disputed jural relation concerning present or prospective obligations (James v Alderton Dock Yards, 256 NY 298, 305 [1931]; Touro College at 679). Thus, a declaratory judgment requires a justiciable controversy, in which the plaintiff has an interest sufficient to constitute standing to maintain the action and that such "controversy involve present, rather than hypothetical, contingent or remote, prejudice to plaintiffs (Am. Ins. Ass'n v Chu, 64 NY2d 379, 383 [1985]; Touro College at 680). A declaratory judgment should only be granted if it will have a direct and immediate effect upon the rights of the parties (Enlarged City School Dist. of Middletown v City of Middletown, 96 AD3d 840, 841 [2d Dept 2012]; Matter of United Water New Rochelle, Inc. v City of New York, 275 AD2d 464, 466 [2d Dept 2000]). As such, a declaratory judgment is premature "when the future event is beyond the control of the parties and may never occur" (Enlarged City School Dist. of Middletown at 841; AB Oil Services, Ltd. v TCE Insurance Services, Inc., 188 AD3d 624, 626 [2d Dept 2020]). Whether to grant a declaratory judgment rests wholly within the court's discretion (Morgenthau v Erlbaum, 59 NY2d 143, 148 [1983]; American News Co. v Avon Pub. Co., 283 AD 1041, 1042 [1st Dept 1954]).
Here, plaintiffs seek a declaration that defendant has been relieved as plaintiffs' property manager and that as such plaintiffs are entitled to access to and control of their bank accounts at Flagstar Bank and plaintiff's MRI account. Thus, plaintiffs seek a declaration of their rights and obligations under the law based on the record before the Court. To that end, plaintiffs' factual assertions, supported by documentary evidence, if proven at trial or by dispositive motion demonstrates that with respect Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis, defendant is no longer their property manager, that Sebco has assumed that role, and that despite proof tendered in support thereof, defendant has refused to provide plaintiffs with access to their own bank accounts and has refused to allow them to access their own MRI data.
To be sure, in his affidavit SG details that while defendant had previously managed Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis's properties, as of January 2023, such relationship was terminated and that thereafter, Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis appointed Sebco to manage Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis' properties, that on July 28, 2023, HPD approved the change in management, and that despite the foregoing, defendant has denied plaintiffs access and control to their own bank accounts and has further denied them access to their own MRI data. SG's assertions are corroborated by the documentary evidence submitted by plaintiffs, namely the six resolutions dated January 20, 2023, wherein Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis terminated defendant, the six management agreements dated March 1, 2023, wherein Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis appointed Sebco as their new property manager, the email dated July 28, 2023, wherein HPD apprised Sebco that it had approved Sebco to manage the properties owned by Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis, and the email dated August 17, 2023 [*12]wherein HPD states that it spoke to GG and apprised him that Sebco was approved to manage the properties owned by Courtlandt, Crotona, Fox, Hunts, Rosina, Tiffany, and Willis, and the legion of email messages, wherein it is clear that even as of August 17, 2023, after HPD confirmed that it had spoken to GG to confirm the change in management, defendant has refused to cede management of the properties owned by Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis because they were not convinced that HPD approved the change in management. 
Given the foregoing evidence, plaintiffs establish that defendant no longer manages the properties owned by Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis, that Sebco has assumed that role, and that as of July 28, 2023, defendant has had no right to prevent access to and cannot control Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis' bank accounts and/or plaintiffs' MRI data. Thus, there is a likelihood that with respect to the cause of action seeking a declaratory judgment, plaintiffs will prevail on the merits. 
The same is true for the cause of action for conversion. "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession" (Colavito v New York Organ Donor Network, Inc., 8 NY3d 43, 49—50 [2006]; see Peters Griffin Woodward, Inc. v WCSC, Inc., 88 AD2d 883 [1st Dept 1982]). Thus, to establish conversion a plaintiff (1) must demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing; and (2) that the defendant exercised an unauthorized dominion over that property to the exclusion of the plaintiff's rights (Meese v Miller, 79 AD2d 237, 242—243 [4th Dept 1981]; Indep. Discount Corp. v Bressner, 47 AD2d 756, 757 [2d Dept 1975]). Property in an action for conversion must be tangible personal property (Indep. Discount Corp. at 757), or money (id. at 757; Peters Griffin Woodward, Inc. at 884).
Here, for the reasons discussed above, with regard to the funds in Courtlandt, Fox, Hunts, Rosina, Timpson, and Willis' bank accounts and/or plaintiffs' MRI data, the record evinces that the foregoing is legally owned by them and that defendant has exercised complete dominion over the same to the exclusion of plaintiffs' rights. Thus, with regard to this cause of action, plaintiffs are likely to succeed on the merits.
With respect to irreparable harm, as discussed above, generally, the inquiry is whether in the absence of a preliminary injunction, usually to preserve the status quo, any judgment on the underlying action would be rendered ineffectual (Ma at 186; Moy at 604). When this is the case, the proponent of a preliminary injunction has demonstrated irreparable harm. Here, SG states that absent injunctive relief allowing it to assume control of the relevant bank accounts and MRI data, Sebco will be unable to properly manage the property owners' properties, the property owners will lose Section 8 subsidies as a result, which are tantamount to rental income. The foregoing, SG asserts, will lead to significant and irreparable harm to plaintiffs and could force Sebco to and the property owners to cease operating. Thus, here, plaintiffs establish that absent injunctive relief, which as will be discussed below, must allow for the alteration of the status quo, plaintiffs will be irreparably harmed. 
With respect the balancing of equities, as discussed above, the same requires that the court look at the prejudice which may accrue to the parties in the event the application for an injunction is granted or denied (Ma at 186-187). In other words, the proponent of a preliminary injunction must show "that the irreparable injury to be sustained is more burdensome to the plaintiff than the harm caused to defendant through imposition of the injunction" (McLaughlin, Piven, Vogel, Inc. at 174 [internal quotation marks omitted]; see Nassau Roofing & Sheet Metal Co., Inc. at 1022). Thus, usually the equities tip in favor of the party who would be irreparably harmed absent the grant of a preliminary injunction (Ma at 187). Here, not only does the finding that absent injunctive relief plaintiffs would be irreparably harmed tip the equities in plaintiffs' favor, but to the extent that all defendant is being asked to do is relinquish control of information it appears it can no longer legally control, injunctive relief will hardly prejudice defendant.
In light of the foregoing, plaintiffs establish entitlement to preliminary injunctive relief enjoining defendant and its agents from affirmatively interfering with Sebco's management of the [*13]property owners' properties. Insofar as plaintiffs also seek to compel defendant to act, namely to affirmatively take all steps required to allow Sebco to assume management of the property owners' properties, such as working with any and all of plaintiffs representatives, plaintiffs also seek a mandatory preliminary injunction, which alters rather than preserves the status quo. On this record, such relief is also warranted.
As noted above, where appropriate, a court has the power to issue a mandatory injunction, which disrupts rather than preserves the status quo, and whereby a party is affirmatively ordered to perform an act (Bachman at 464; Second on Second Cafe, Inc. at 265). In that case, the movant would receive some form of the ultimate relief sought as a final judgment, and such relief is granted only in unusual situations, where the granting of the relief is essential to maintain the status quo pending trial of the action (Rosa Hair Stylists, Inc. at 794). Mandatory injunctions, however, should not be granted, absent extraordinary circumstances and only when the right to such relief is clearly established (Second on Second Cafe, Inc. at 360-361; Rosa Hair Stylists, Inc. at 794).
Here, the record establishes that defendant no longer manages the property owners' properties, such that it has no right to deny plaintiffs access to their very own bank accounts and MRI data. Indeed, as to the property owners, there appears to be no basis to bar them from accessing their own funds. Accordingly, where as here, the record also establishes that as it relates to the property owners Sebco has assumed defendant's role, and that in order to perform all of the duties attendant thereto, it must have unfettered access to and control of the relevant bank and MRI accounts, the preservation of the status quo would accord plaintiffs insufficient relief. Stated differently, in order to prevent irreparable harm to plaintiffs, the status quo, which, here, is defendant's refusal to allow plaintiffs the requisite access and control of the relevant accounts is useless. Thus, defendant must be compelled to take any and all affirmative steps to allow Sebco to assume its role as the new property manager for the property owners. Accordingly, here, for the reasons discussed above, plaintiffs establish the requisite clear right to madatory injunctive relief (Second on Second Cafe, Inc. at 360-361; Rosa Hair Stylists, Inc. at 794).
Given the nature of the preliminary injunction, inter alia, defendant's relinquishment of control of the relevant bank accounts and MRI data, the Court shall set a minimal bond and only because the law demands it. Quite frankly, it is hard to fathom how defendants could be harmed if it later turns out that this preliminary injunction should not have been granted. This is particularly true here, where pursuant to the record, the property owners do not want defendant to manage their property. As noted above, the amount of the undertaking is solely within the court's discretion and should be as much as rationally necessary to compensate defendants for any potential damages should it later be determined that a preliminary injunction was unwarranted (Clover St. Assoc. at 313; Kazdin at 457). The undertaking, thus, represents the amount and indeed the limit of damages to which defendants will be entitled if it is determined that no preliminary injunction ought to have been granted (Bonded Concrete, Inc. at 855). Here, the only potential damage to defendant is its legal fees incurred in defending this action. Again, unless the property owners have fabricated evidence, such as the resolutions terminating defendant, the new management agreements appointing Sebco as the new property manager for the property owners', and an email from HPD authorizing the change in management, it is clear that the property owners want nothing to do with defendant. Thus, the amount of the undertaking is fixed at $20,000.
Nothing submitted or urged by defendant warrants denial of the instant application. 
To the extent that defendant urges that denial of the instant application is unwarranted because plaintiffs have failed to meet their burden of proof, such assertion is unavailing [FN3]
. 
Defendant submits an affidavit by GG, wherein he states, in pertinent part, as follows. On January 9, 2023, GG terminated SG after SG refused to provide access to defendant's general ledger and payroll. GG sought such access because he heard that SG was using company funds to renovate properties personally owned by SG. GG discovered that SG was using company funds to renovate properties he owned in the Bronx and Connecticut. GG also discovered that SG was using company funds to renovate homes owned by Allen in Westchester and New Jersey. In 2022, SG paid $68,000 to Critter Ritter Pest Control (Critter). Upon a review of the invoice for payments made to Critter, it appeared suspicious in that the invoice was unaccompanied by documentation providing a signature for the tenant who received the services indicated therein, as was the custom and practice. Furthermore, beyond a PO Box, the invoice had no physical [*14]address, email, or phone number, and the internet link did not work. Further research revealed that the business was registered to a home owned by Allen and that Critter's registered agent was Allen's husband. GG also asserts that on August 10, 2023, in order to confirm whether Sebco had been approved to assume defendant's management role with respect to the property owners, GG spoke to an HPD employee who stated that HPD records contained no such indication. Thereafter, GG spoke to an employee at HPD, who indicated that while HPD had approved a change in management for the property owners, such approval had occurred in July 2023. 
Defendant submits an affirmation from Siegel, wherein he states that attempts to confirm with HPD whether Sebco had been approved to manage the properties owned by the property owners were fruitless. 
Defendant submits the invoices referenced by GG and by counsel as well as deeds, New York State Department of State records, and other documents corroborating the same defendant's allegations. 
Base on the foregoing, each and every basis urged for denial of the instant motion fails. 
First, defendant asserts that plaintiffs fail to establish that HPD has authorized the change in management companies alleged by plaintiff. Given the record, which contains several emails from HPD, two of which establish HPD's approval of the change in management company alleged, the fact that Siegel, GG, and counsel for defendant have been unable to confirm that with HPD directly is absurd, belied by the documentary evidence submitted by plaintiffs, and in any event irrelevant. As already noted, a plaintiff seeking a preliminary injunction need not conclusively establish guaranteed success on the merits and, thus, issues of fact raised by the defendant cannot serve as a basis for denial of any motion seeking a preliminary injunction (Ma at 187; Moy at 605; Stockely at 536; Demartini at 689). Here, at best, the foregoing assertions by defendant, raise non-dispositive issues of fact with respect to HPD's approval.
Second, to the extent that defendant opposes the instant motion on behalf of Tiffany and Crotona, the instant application does not seek relief with respect to those plaintiffs and as such this issue warrants no further discussion. 
Third, to the extent that defendant seeks to have the instant motion denied because Sebco has unclean hands, defendant's evidence of the same is inadequate and does not, as a matter of law, preclude the relief sought.
As noted above, injunctive relief is unavailable if the proponent of such relief has unclean hands with respect the events undergirding the litigation (Amarant at 434; see Victor Fischel & Co. at 187; 276-43 Gourmet Grocery, Inc. at 433). However, unclean hands serves to bar equitable relief only if "the plaintiff is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in 16 litigation and the party seeking to invoke the doctrine was injured by such conduct" (Natl. Distillers & Chem. Corp. at 15-16).
Here, defendant fails to establish that SG's alleged conduct is immoral and unconscionable so as to preclude injunctive relief. At best, defendant's evidence amounts to SG's use of vendors affiliated with Allen, at a time when she was employed by defendant. To the extent the defendant's evidence is bereft of any proof that the services for which SG paid were not actually provided to defendant's client, the use of relatives by Allen, if true, is at best inappropriate, but not immoral or unconscionable. Moreover, while defendant alleges that the invoices were not for services provided to defendant's clients and instead to properties owned by SG and Allen, other than allegations, the record is bereft of any actual proof. Indeed, to suggest, as urged, that because a company does not have an internet presence or an advertised number is tantamount to a sham company which does not exist is a leap this Court is unwilling to make. Lastly, even if the foregoing conduct was immoral or unconscionable, to preclude the relief sought by plaintiffs, such conduct would have to bear or relate to the instant litigation. Here, even if, as urged, SG and Allen stole and/or misappropriated defendant's funds, such conduct has no relationship to instant action, which seeks to, inter alia, compel defendant to relinquish control over plaintiffs MRI data and the property owners's bank accounts. It is hereby
ORDERED that upon plaintiffs posting an undertaking in the amount of $20,000, the preliminary injunctive relief sought on pages 2-4 of plaintiffs' Order to Show Cause is granted (NY St Cts Elec Filing [NYSCEF] Doc No. 117 at 2-4), including that defendant take all steps necessary to transfer all management duties of the properties owned by plaintiffs to Sebco. It is further
ORDERED that defendants be hereby enjoined from interfering with the management of the property owners' properties by Sebco. It is further
ORDERED that plaintiffs serve a copy of this Decision and Order with Notice of Entry upon defendants within thirty (30) days hereof.
This constitutes this Court's decision and Order.
Dated : February 20, 2024
Bronx, New York
HON. FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1: While plaintiffs' complaint initially brought this action on behalf of 15 plaintiffs, the first amended complaint limits the instant action to nine plaintiffs, and the instant application only seeks relief on behalf of seven plaintiffs.

Footnote 2: The first amended complaint was filed as an exhibit to plaintiffs' application for leave to amend the complaint. On September 28, 2023, this Court denied the foregoing motion as unnecessary because by virtue of denial of defendant's pre-answer motion to dismiss, read together CPLR §§ 3025(a) and 3211(f), allowed plaintiffs to amend the complaint without leave of court. Thus, by implication, the first amended complaint was deemed filed and served (NY St Cts Elec Filing [NYSCEF] Doc No. 75 at 5 ["ORDERED that defendant may serve a response to the First Amended Complaint within 20 days hereof."]).

Footnote 3: It bears noting that defendant's opposition papers are most notable for what they fail to assert, namely that they have any right to continue to manage the property owners' properties and as such, that they have an unfettered right to hold on to their funds (the bank accounts) and deny them access to their MRI data. Indeed, defendant's suggested compromise - that a receiver be appointed to manage the property owners' properties and that provided Sebco pay for its use of the MRI data, it can - is tantamount to a concession that defendant' has absolutely no right to prevent and obstruct plaintiffs from the access and control which they seek. Stated differently, if defendant had any basis to retain its management of the property owners' properties, it should have stated the same and certainly would not agree to relinquish the same to a receiver. To the extent that the parties concede that absent HPD approval, Sebco could not assume the management of the property owners' properties, as of August 17, 2023, when the record evinces that HPD spoke to GG and apprised him that Sebco had been approved to manage the instant properties, defendant should have relinquished control of the relevant bank accounts and MRI data, thereby obviating the need for this Decision and Order. Indeed, the first time the parties appeared before this Court, after plaintiffs filed their motion containing evidence that defendant had been terminated and that Sebco had been allowed to assume defendant's role, defendant agreed to relinquish control of the relevant bank accounts and MRI data, upon oral confirmation from HPD that Sebco had received approval to assume defendant's role. Thereafter, on December 7, 2023, the parties engaged in a Zoom call with HPD, where "Ahmed Tigani, First Deputy Commission of HPD, read a prepared statement saying simply [] that HPD had approved contracts for SEBCO to manage the six housing projects at issue" (NY St Cts Elec Filing [NYSCEF] Doc No. 165 at 1). Notably, in addition to asserting that Mr. Tigani's statements were insufficient to satisfy defendant, defendant then asserted that SG is alleged to have misused defendant's funds (id. at 2-3). Thus, not only did defendant insist on an unreasonable quantum of proof regarding Sebco's approval, it now sought to withhold access to the bank accounts and MRI data for a new, and as discussed herein, baseless reason. Indeed, in an email sent to the parties on January 2, 2024, the Court noted as much, stating that
 the Court recall[ed] that defendant asserted that if in addition to the documents appended to plaintiffs' application — demonstrating HPD approval to have plaintiff manage six of the plaintiff properties — HPD further confirmed such approval, defendants would then turn over plaintiffs bank accounts and related data. Now, by defendant's own admission despite having received the foregoing confirmation, it has moved the goal post, averring that HPD gave plaintiff management approval absent some very relevant and allegedly damming information concerning misconduct by plaintiff and/or its employee. Even if this were true, it would not likely avail defendant. Indeed, here, the relevant inquiry is whether HPD gave its approval not whether it was somehow misled into providing the same. If the record establishes that defendant has been relieved of all of its management responsibilities, which appears to be the case, as the Court noted during oral argument, defendant no longer has any standing to somehow advocate on behalf of its former clients so as to withhold the access sought by plaintiffs. This is precisely what defendant appears to be doing.